UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JANE DOE ON BEHALF OF HERSELF AND SIMILARLY SITUATED PEOPLE,<br><br>PLAINTIFF,<br><br>V.<br><br>D'ONOFRIO GENERAL CONTRACTORS CORPORATION, ALL STATE 12 GENERAL CONTRACTING CORPORATION, CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., DOE CORPORATE ENTITY, AND NORWING REYES, IN HIS PERSONAL AND PROFESSIONAL CAPACITIES.<br><br>DEFENDANTS. | COMPLAINT<br><br>JURY TRIAL DEMANDED |

Plaintiff Jane Doe,[1] represented by Seppinni Law, alleges based on information and belief at all relevant times:

## INTRODUCTION

1.      Plaintiff Jane Doe was the lone female flagger on a team of male construction workers at D'Onofrio General Contractors Corporation ("D'Onofrio").[2] After she rebuffed her supervisor Norwing Reyes's repeated sexual demands, Mr. Reyes pushed her out of the company.

2.      As Ms. Doe learned from her former foreman, the company declined to rehire her after a temporary turnover, though it rehired her colleagues, because Mr. Reyes had lied to the company's owner, telling him that *she* had pursued a relationship with *Mr. Reyes.*

3.      This was the culmination of harassment that began even before Ms. Doe's first day on the job. When he learned Ms. Doe was joining, Mr. Reyes stalked her social media and sent her

---

[1]      Plaintiff will shortly file a Motion to Proceed Anonymously.

[2]      During the events described below, on information and belief, all or part of D'Onofrio was acquired by a Doe Corporate Entity ("Doe Entity"). D'Onofrio and Doe Entity are collectively referred to as "the company" hereafter.

messages. After she began, he constantly commented on her clothing and explicitly ordered her male coworkers to ignore and isolate her. When he eventually demanded sex in exchange for her job security and Ms. Doe refused, Mr. Reyes lied to the company's owner, characterizing Ms. Doe as a "homewrecker" to ensure she was fired while every one of her colleagues was retained.

4.     After Defendants fired Ms. Doe, Mr. Reyes forced Ms. Doe to meet him in his vehicle to retrieve her final paycheck. He did this so that he could attempt to rape Ms. Doe in his truck and succeeded in sexually assaulting her during this encounter.

5.     Ms. Doe's isolation and vulnerability is emblematic of the status of women at the company. Almost no women serve in general construction roles, while 70% of flaggers are women. The division is insidious, because male laborers are unionized and receive proper rates of prevailing wages, while flaggers are not unionized and are paid far below their prevailing-wage entitlement. Ms. Doe—even as she had to risk rape for her paychecks—went illegally underpaid, too, in violation of regulatory requirements imposed on the company under its contracts with Consolidated Edison Company of New York, Inc. ("Con Ed"), and under Con Ed's agreements with New York City.

6.     Accordingly, Ms. Doe asserts causes of action under the Fair Labor Standards Act (FLSA), the New York City Victims of Gender-Motivated Violence Protection Act (GMVA), the New York State Human Rights Law (NYSHRL), the New York City Human Rights Law (NYCHRL), and the New York Labor Law (NYLL), to hold the Defendants accountable for discrimination, retaliation, gender-based violence, and denial of proper wages.

2

## JURISDICTION AND VENUE

7.      The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims under 29 U.S.C. § 207 (the FLSA) arise under federal law.

8.      The Court has supplemental jurisdiction over Plaintiff's state and local law claims under 28 U.S.C. § 1367(a). Plaintiff's state and local law claims derive from the same common nucleus of operative fact as the federal claims and form part of the same case or controversy.

9.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## ADMINISTRATIVE PROCEDURES

10.     To comply with New York City Administrative Code § 8-502(c), Plaintiff will serve a copy of this Complaint on the New York City Commission on Human Rights and the Corporation Counsel of the City of New York within 10 days of filing this action.

## THE PARTIES

11.     Plaintiff Jane Doe is a citizen of New York. From March 1, 2023 to February 9, 2024, Defendants employed Plaintiff. At all relevant times, Plaintiff was an "employee" within the meaning of all relevant statutes.

12.     Defendant D'Onofrio General Contractors Corp. is a New York corporation with its principal place of business located at 202 28th St, Brooklyn NY 11232. At all relevant times, D'Onofrio was Plaintiff's "employer" within the meaning of all relevant statutes. D'Onofrio directed, controlled, and compensated Plaintiff's work. At all relevant times, D'Onofrio was an enterprise engaged in interstate commerce or in the production of goods for commerce and had an annual gross volume of sales made or business done of not less than $500,000.

13.     Defendant All State 12 General Contracting Corp. ("All State 12") is a New York corporation with its principal place of business located at 150-46, Suite B, Whitestone, New York 11357. At all relevant times, All State 12 was Plaintiff's "employer" within the meaning of all relevant statutes. All State 12 directed, controlled, and compensated Plaintiff's work. At all relevant times, All State 12 was an enterprise engaged in interstate commerce or in the production of goods for commerce and had an annual gross volume of sales made or business done of not less than $500,000. All State 12 was an employment entity that contracted flaggers to work at construction sites, and was thus a "joint employer" with the company.

14.     Defendant Consolidated Edison Company of New York, Inc. is a New York corporation with its principal place of business in New York City, New York.

15.     On information and belief Defendant Doe Corporate Entity is a corporation with its principal place of business in New York City, New York. On information and belief Doe Corporate Entity acquired D'Onofrio, as set forth below, including all D'Onofrio's assets and liabilities.

16.    Defendant Norwing Reyes is a citizen of New York. During the relevant period, Norwing Reyes was Jane Doe's supervisor. Defendant Reyes exercised active operational control over the company, possessed the power to hire and fire Plaintiff, supervised Plaintiff's work schedules and conditions of employment, and determined Plaintiff's rate and method of pay. Accordingly, Norwing Reyes is an "employer" subject to individual liability under the FLSA and NYLL.

## THE FACTS

**1.    Mr. Reyes Harassed and Isolated Ms. Doe from the Start of Her Employment, and Before**

17.    Ms. Doe began working for Defendants on March 1, 2023.

18.    She reported to her supervisor, Norwing Reyes.

19.    Defendants assigned Ms. Doe to an eleven-person team—her and 10 male construction workers.

20.    The construction team on which Ms. Doe worked performed work under contracts between the company and Con Ed.

21.    They would open public streets in New York City, mostly in the Bronx, to lay or repair power lines on behalf of Con Ed.

22.    Ms. Doe worked as a flagger, directing worksite traffic.

23.    This is a gendered role; about 70% of flaggers are women, while women occupy almost no other construction-site role to any significant degree.

24.    While the men working in laborer roles were unionized, the flaggers were not.

25.    The flaggers, like Ms. Doe, did not receive the appropriate prevailing wage for the work they performed.

26.    The company's disrespect for its female workers included the failure to pay them, encompassing a culture of harassment and rape towards women at the company.

27.    Like any woman working on a construction site, Ms. Doe was acutely aware of the dangers of harassment.

28.    She endeavored to keep interactions with male colleagues cordial and professional.

29.    But, here, she never had a fair chance to protect herself.

30.    Mr. Reyes had targeted Ms. Doe even before her first day.

7

31. After he found out she would be joining, he stalked her social media accounts and sent her unsolicited messages on Instagram.

32. From Ms. Doe's first day, Mr. Reyes flirted with her and paid her unwelcome compliments.

33. As events would show, he was meticulous in ratcheting up the pressure on Ms. Doe, and in using his power as a supervisor to extract sexual gratification from her.

34. For instance, Mr. Reyes unnecessarily and incessantly "checked in" on Ms. Doe via phone calls, message or by approaching her on the job site.

35. During Ms. Doe's 11 months working with him, Mr. Reyes continuously scrutinized her clothing with questions, comments, or unwanted compliments.

36. Mr. Reyes made comments or paid unwanted compliments like this more than 20 times during Ms. Doe's tenure.

37. Mr. Reyes isolated Ms. Doe by forbidding her from speaking or eating with her male colleagues, reasoning that "males and females should be separate at work."

38. Mr. Reyes was jealous when Ms. Doe interacted with other men at work.

39. For instance, on one occasion, a male colleague drove Ms. Doe to the worksite.

40. When Mr. Reyes found out about this, he immediately called Ms. Doe's foreman and told him that no one from the team was authorized to drive her to the worksite.

41. This was false.

42. There was no company policy against team members driving each other to a worksite.

43. On another occasion, when Ms. Doe briefly worked on a team that was not under Mr. Reyes' direct supervision, a male colleague drove her to the worksite without consequences.

44. Mr. Reyes had simply fabricated a "rule" to assert his dominance over Ms. Doe and isolate her.

8

45.    Picking up on Mr. Reyes's behavior, colleagues began warning Ms. Doe when Mr. Reyes was around.

46.    Mr. Reyes also called Ms. Doe on several occasions to solicit sexual favors in exchange for her job security.

47.    Mr. Reyes couched his conversations with Ms. Doe in innuendo, ensuring even routine comments carried a demeaning, sarcastic, or suggestive second meaning, some of which is difficult to capture idiomatically because the two spoke Spanish with one another.

48.    The power imbalance between the two left Ms. Doe vulnerable during these conversations, forcing her to constantly come up with ways to deflect Mr. Reyes's sexual advances.

## 2.    Defendants Fired Ms. Doe For Declining Mr. Reyes's Sexual Advances

49.    In early 2024, D'Onofrio notified Ms. Doe and her team that they were being temporarily laid off because another company, Doe Entity, was acquiring D'Onofrio.

50.    But Doe Entity planned to subsequently rehire all the employees.

51.    It is unclear what the business or administrative need was for this, but it was presented to Ms. Doe as an incident of Doe Entity's acquiring D'Onofrio, and she was led to understand that she was not being fired.

52.    But on February 9, 2024, Mr. Reyes called Ms. Doe and told her that Defendants had permanently fired her.

53.    During the call, Mr. Reyes suggested that he could help Ms. Doe. She knew this would mean giving in to his sexual demands, and she did not respond.

54.    Meanwhile, Defendants recalled all her colleagues to work.

55.    When Ms. Doe reached out to her foreman for an explanation for her isolated firing, he told her it was because Mr. Reyes had told the owner of the company that *she* was the one who "wanted to enter into a sexual relationship" with Mr. Reyes and "break his home."

9

56.    Ms. Doe was disgusted but powerless.

57.    She was a low-level employee; Mr. Reyes had the ear of his employer and the power to decide who would work for him.

58.    Mr. Reyes had wielded this power with the kind of deftness that comes from practice. He acted skillfully and pitilessly, invoking the dangers of Ms. Doe's sexuality ("home wrecker") to manipulate the company into firing her.

59.    He apparently had no trouble convincing the company and its owners that Ms. Doe, the woman, was the real threat in this situation.

60.    The company and its owners did nothing to investigate whether anything he said was true.

61.    Yet Mr. Reyes was not content to compromise Ms. Doe economically and embarrass her at the workplace.

62.    As events would show, he was determined to humiliate her, destroy her dignity, and put her in her place.

### 3.    Mr. Reyes Sexually Assaults Ms. Doe Using Her Final Paycheck to Lure Her into His Truck

63.    Historically, a team driver delivered Ms. Doe's paychecks directly to her desired location or her home.

64.    Following her firing, however, the driver did not deliver her final check.

65.    When Ms. Doe inquired, the driver explained that Mr. Reyes had ordered him not to give Ms. Doe her final paycheck and had asked her to retrieve it from the office herself.

66.    Like most working people, Ms. Doe could not afford to pass up a paycheck.

67.    Even though she feared further harassment, she had no choice but to try to navigate the situation and get her final paycheck.

68.   When she was about to go to the office, Mr. Reyes contacted her.

69.   Mr. Reyes demanded Ms. Doe's location, claiming that he "needed to speak" with her and that he would personally deliver the check to her in his truck.

70.   Once there, Mr. Reyes pressured Ms. Doe to get into his truck.

71.   Again, needing her paycheck, she reluctantly acceded.

72.   With her seated in the passenger seat of the truck, Mr. Reyes asked "Why are you acting this way?"

73.   Before Ms. Doe could respond, Mr. Reyes sexually assaulted her.

74.   He grabbed her arm to immobilize her and pawed at her breast.

75.   He then attempted to force her hand onto his genitals.

76.   Terrified, Ms. Doe tore herself away and fled the vehicle, escaping Mr. Reyes's attempted rape.

77.   Mr. Reyes then harassed Ms. Doe with repeated phone calls.

78.   Ms. Doe ignored them for as long as she could fearing a recurrence of the sexual innuendo and solicitations that defined his calls during her employment.

79.   Ms. Doe's fear turned to reality when she eventually answered his call on March 30, 2024.

80.   At first, Mr. Reyes feigned a need to discuss tax documents.

81.   A couple minutes into the call, however, dropping the pretext, he abruptly asked, "listen, what are you going to give me for the job?"

82.   Ms. Doe understood Mr. Reyes to be offering her job back if she acceded to his sexual demands.

83.   She, of course, did not agree and was not offered her job back.

84.    Recognizing the sexual subtext, Ms. Doe deflected by reminding him of his family and offering to buy him lunch.

85.    Undeterred, Mr. Reyes responded, "Holy shit, listen, just lunch? . . . No, what will you *do*?"

86.    When Ms. Doe asked what he wanted in exchange for her job, Mr. Reyes replied, "No, I would tell you that in person."

87.    Ms. Doe immediately redirected the conversation to the tax documents. She ended the call as soon as she could.

88.    Even with a thick skin from years working on male-dominated construction sites, what Mr. Reyes had done sickened Ms. Doe and has left her deeply shaken.

### 4.    Mr. Reyes Interfered with Ms. Doe's New Employment

89.    Luckily, she was able to move on to a new job.

90.    But Mr. Reyes hounded her.

91.    On or around February 14, 2024, Ms. Doe secured a new position with American Safety System, Inc.

92.    Within days of Ms. Doe starting her new job, her former foreman warned her that Mr. Reyes was attempting to sabotage her.

93.    The foreman informed Ms. Doe that Mr. Reyes had contacted her new employer to spread lies about her and "warn" them of her behavior.

94.    Ms. Doe took the foreman's warning to be true—she recognized this as the same playbook Mr. Reyes used to orchestrate her firing months earlier.

95.    She now worked in constant fear that Mr. Reyes would successfully weaponize these same lies to destroy her new livelihood.

96.    Approximately four months into her new job, Ms. Doe met with the company's owner following a workplace accident.

97.    During this meeting, the owner questioned Ms. Doe unprompted about her previous employment with Defendants and how that relationship ended.

98.    When Ms. Doe described the sexual harassment and retaliation she had endured because of Mr. Reyes, the owner—again, unprompted—instructed her not to "bother" suing Defendants.

99.    He insisted that a lawsuit "wouldn't go anywhere" because Defendants "have a lot of money."

100.    At no point during the meeting did Ms. Doe mention a lawsuit; the owner directed the conversation there of his own accord.

101.    Based on this series of events, it is probable that Mr. Reyes did in fact reach out to Ms. Doe's new employer to spread either rumors or threats against her.

## CAUSES OF ACTION

### CAUSE OF ACTION 1
#### Crime of Violence Motivated by Gender
#### in Violation of the New York City Victims of Gender-Motivated
#### Violence Protection Act
#### (D'Onofrio, All State 12, Doe Entity, Con Ed, and Norwing Reyes)

102.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

103.    Defendant Reyes's conduct, including but not limited to, sexual assault, constitute "crimes of violence" and "crimes of violence motivated by gender" against Plaintiff as defined by the New York City Gender Motivated Violence Act, N.Y.C. Admin. Code § 10-1101 *et seq.* (2017).

104.    Under the GMVA, "a party who commits, directs, enables, participates in, or conspires in the commission of a crime of violence motivated by gender has a cause of action against such party in any court of competent jurisdiction" for such conduct.

105.    Defendant Reyes's conduct constitutes crimes of violence against Plaintiff motivated: (i) by her gender; (ii) on the basis of her gender; and/or (iii) due, at least in part, to an animus based on her gender.

106.    By the actions and omissions described above, amongst others, the D'Onofrio, All State 12, Con Ed, and Doe Entity Defendants enabled, participated in and/or conspired in "a crime of violence motivated by gender."

107.    As a result of Defendants' conduct, Plaintiff has suffered damages, including but not limited to, physical harm, emotional distress, mental anguish, economic loss and/or special damages, for which she is entitled to an award of all damages applicable by law.

14

## CAUSE OF ACTION 2
### Gender Discrimination and Harassment
### in Violation of the NYCHRL
### *(D'Onofrio, All State 12, Doe Entity, and Norwing Reyes)*

108.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

109.    Under the NYCHRL, it is a violation to treat an employee less well than other employees because of their protected characteristics.

110.    By the actions detailed above, among others, Defendants have discriminated against and harassed Plaintiff based on her gender in violation of the NYCHRL, by, among others, harassing her in the workplace, discriminating against her by prohibiting her from interacting with her colleagues, terminating her employment, and discriminating against her in paying her compensation.

111.    By the actions detailed above, the company also pursued policies with a disparate impact on female employees, specifically, failing to pay flaggers at the prevailing wage rate.

112.    As a direct and proximate result of Defendant's unlawful actions in violation of NYCHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which she is entitled to an award of damages.

113.    Defendant's unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 3
### Retaliation and Interference in Violation of the NYCHRL
### *(D'Onofrio, All State 12, Doe Entity, and Norwing Reyes)*

114.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

115.    By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYCHRL, including terminating her employment and spreading rumors and/or making threats to Ms. Doe's new employer.

116.    As a direct and proximate result of Defendants' unlawful retaliatory and interfering conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

117.    As a direct and proximate result of Defendants' unlawful retaliatory and interfering conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

118.    Defendants' retaliatory and interfering actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

16

**CAUSE OF ACTION 4**
**Gender Discrimination and Harassment**
**in Violation of the NYSHRL**
*(D'Onofrio, All State 12, Doe Entity, and Norwing Reyes)*

119.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

120.    By the actions detailed above, among others, Defendants have discriminated against and harassed Plaintiff based on her gender in violation of the NYSHRL, by, among others, harassing her in the workplace, discriminating against her by prohibiting her from interacting with her colleagues, terminating her employment, and discriminating against her in paying her compensation.

121.    By the actions detailed above, the company also pursued policies with a disparate impact on female employees, specifically, failing to pay flaggers at the prevailing wage rate.

122.    As a direct and proximate result of Defendants' unlawful actions in violation of NYSHRL, Plaintiff suffered and continues suffering economic damages, mental anguish, and severe emotional distress for which she is entitled to an award of damages.

123.    Defendants' unlawful actions were done with willful negligence, recklessness, or a conscious disregard of Plaintiff's rights or conduct so reckless as to amount to such disregard of Plaintiff's rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 5
### Retaliation in Violation of the NYSHRL
### *(D'Onofrio, All State 12, Doe Entity, and Norwing Reyes)*

124. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

125. By the actions detailed above, Defendants retaliated against Plaintiff based on her protected activities in violation of the NYSHRL, including terminating her employment.

126. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary or economic harm, for which she is entitled to an award of damages, along with reasonable attorneys' fees and expenses.

127. As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

128. Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

## CAUSE OF ACTION 6
### Violation of New York Labor Law 191
### *(D'Onofrio, All State 12, Doe Entity, and Norwing Reyes)*

129.     Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

130.     During Plaintiff's employment, Defendants were subject to New York Labor Law § 191 *et seq.*

131.     Under NYLL 191, "[i]f employment is terminated, the employer shall pay the wages not later than the regular pay day for the pay period during which the termination occurred."

132.     Defendants violated NYLL 191 when, after Plaintiff's termination, they failed to deliver her final paycheck through the regular method of delivery on the regular pay day; forced her into an encounter that resulted in sexual assault; and conditioned the receipt of her final paycheck on sexual favors.

133.     As a direct and proximate result of Defendants' unlawful retaliation under NYLL 191, Plaintiff suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

134.     Plaintiff is also entitled to liquidated damages, front pay, lost compensation and damages, costs, and reasonable attorneys' fees.

## CAUSE OF ACTION 7
### Battery and Intentional Infliction of Emotional Distress
### *(Norwing Reyes)*

135.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

136.    Mr. Reyes subjected Ms. Doe to unwanted sexual touching and is therefore liable for battery under the laws of the State of New York.

137.    Mr. Reyes intentionally and without justification inflicted emotional distress upon Ms. Doe, by subjecting her to consistent and humiliating harassment and sexually assaulting her, with the goal of breaking down her will to resist and acceding to his sexual demands.

138.    This conduct was extreme and outrageous.

139.    Mr. Reyes is therefore liable for intentional infliction of emotional distress under the laws of the State of New York.

140.    As a direct and proximate result of Reyes's unlawful conduct, Plaintiff suffered and continues to suffer harm for which she is entitled to an award of monetary damages and other relief.

### CAUSE OF ACTION 8
### Failure to Pay Overtime Under the FLSA 29 U.S.C. § 207
*On Behalf of Plaintiff and a 29 USC 216(b) Collective of Similarly Situated Employees*
*(D'Onofrio and Doe Entity)*

141. Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

142. 29 U.S.C. § 207(a) requires covered employers to pay all non-exempt employees at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours per workweek.

143. During the FLSA Collective Period, Plaintiff and the FLSA Collective were non-exempt "employees" within the meaning of the FLSA.

144. During the FLSA Collective Period, Defendants were the covered "employer" of Plaintiff and the FLSA Collective within the meaning of the FLSA.

145. During the FLSA Collective Period, Plaintiff and the FLSA Collective have been entitled to the rights, protections and benefits provided under the FLSA.

146. Plaintiff and the FLSA Collective are not exempt from overtime compensation as established by the commissioner's wage order or otherwise provided by New York State law or regulation.

147. During the FLSA Collective Period, Defendants willfully violated the FLSA by failing to pay Plaintiff and the FLSA Collective all overtime wages of not less than one and one-half times their regular hourly wage for each hour worked in excess of 40 hours per workweek.

148. Specifically, during Plaintiff's employment, D'Onofrio and Doe Entity were subject to prevailing wage requirements, as a company performing contracts requiring the excavation of public roads, but failed to pay the prevailing wage rate, as set forth below.

149. Under the FLSA, the baseline wage, i.e., the regular hourly wage, for calculating overtime rates is the wage that a worker is lawfully owed.

150. Because the regular and lawful hourly rate was the prevailing wage and rate, and because Ms. Doe and all similarly situated flaggers were not paid the prevailing wage rate, they were also not paid proper rates of overtime.

151. During the FLSA Collective Period, Defendants knew that Plaintiff and the FLSA Collective worked more than 40 hours per workweek for Defendants. Specifically, Plaintiff during her tenure worked over 40 hours per week, and worked a total of 40 hours of overtime during that tenure. However, Defendants did not pay them adequate overtime for hours worked in excess of 40 hours per workweek.

152. As a result of Defendants' failure to pay Plaintiff and the FLSA Collective overtime at a rate of one and one-half times their regular rate of pay for hours worked in excess of 40 hours per workweek, Defendants violated the FLSA.

153. The foregoing conduct of Defendants constitutes willful violations of the FLSA.

154. The company's behavior was willful and reckless, especially given that Con Ed has been subject to numerous lawsuits in recent years because of its failure to pay flaggers, including lawsuits alleging that Con Ed and its contractors, such as the company, were failing to pay prevailing wages and attendant overtime to flaggers under City Law. It was also willful and reckless in that the company routinely pays others proper prevailing wage rates and overtime under identical rules and fully understands its obligation to do so.

155. Defendants have no good faith justification or defense for failing to pay Plaintiff and the FLSA Collective the overtime wages mandated by the FLSA.

156. 29 U.S.C. § 216(b) provides that Plaintiff and the FLSA Collective are entitled to recover the full amount of their wage underpayments during the three years preceding the filing of this Complaint, plus periods of equitable tolling, an award of costs and reasonable attorneys' fees incurred in pursuing this claim, an award of prejudgment interest paid at the applicable legal rate, and

22

a penalty in the amount of 100% of the total payment due for the relevant period as Defendants willfully had no good faith basis to believe their wage payments to Plaintiff and the FLSA Collective complied with the FLSA.

## CAUSE OF ACTION 9
### Breach of Contract for Failure to Pay Prevailing Wage Rates
*On Behalf of Plaintiff and a Fed. R. Civ. P. 23 Class of Similarly Situated Employees*
*(D'Onofrio, Doe Entity, and Con Ed)*

157.    Plaintiff repeats and realleges each allegation in the preceding paragraphs as if fully set forth herein.

158.    During Plaintiff's employment, she worked on construction sites pursuant to contracts between Con Ed and the Company.

159.    These contracts were in turn governed by contracts and agreements between Con Ed and New York City.

160.    Under N.Y.C. Admin. Code § 19-142,

[a] person to whom a permit may be issued, to use or open a street, shall be required, before such permit may be issued, to agree that none but competent workers, skilled in the work required of them, shall be employed thereon, and that the prevailing scale of union wages shall be the prevailing wage for similar titles as established by the fiscal officer pursuant to section two hundred twenty of the labor law, paid to those so employed. No permit shall be issued until such agreement shall have been entered into with the department, and all such permits hereafter issued shall include therein a copy of this provision.

161.    On information and belief, Con Ed obtained permits from the City of New York to open streets to perform maintenance and construction work on power cables and other infrastructure.

162.    Accordingly, Con Ed was required to include in its contracts with the company a provision that workers on projects requiring the opening of streets would be paid the prevailing wage as set by the New York City Comptroller's Office (i.e., the "fiscal officer" designated by "section two hundred twenty of the labor law.")

163.    Con Ed's agreement with New York City was contractual. Con Ed promised to ensure that workers on Con Ed projects were paid prevailing wage in exchange for receiving road opening permits from New York City.

164.    On information and belief, it did include such provisions in its contract.

24

165. Both the company and Con Ed failed to pay prevailing wages set by the City Comptroller to flaggers, including to Ms. Doe and all similarly situated flaggers employed by the company.

166. Accordingly, both Con Ed and the company breached agreements contained in their contract with one another. Con Ed also breached its contract and agreement with New York City to ensure that workers on Con Ed projects were paid prevailing wage.

167. Ms. Doe and the other flaggers were third-party beneficiaries of the aforesaid contracts, which were entered into with the specific intent to ensure the prevailing wage would be paid to workers like Ms. Doe and all similarly situated flaggers.

168. As a direct and proximate result of the company and Con Ed's failure to pay prevailing wages, Ms. Doe has suffered and continues to suffer economic damages.

169. Ms. Doe was paid at the rate of twenty dollars per hour.

170. According to the Comptroller's Prevailing Wage Schedules, she should have been paid a combined wage and benefit rate of over $94 per hour for the entire period that she worked for Defendants.

171. Ms. Doe and all similarly situated flaggers are therefore entitled to damages, including all damages available under applicable law.

172. Accordingly, Plaintiff brings this claim as a class action pursuant to the Federal Rule of Civil Procedure 23 on behalf of herself and as the Class Representative of the following persons:

All persons who were/are employed by Defendants D'Onofrio or All State as flaggers on Con Ed commissioned contracts to open streets ("Prevailing Wage Class") in the limitations period ("Class Period").

173. Plaintiff reserves the right to modify the proposed class definition at a later stage of litigation.

174. The Prevailing Wage Class satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23(a).

175. The Prevailing Wage Class satisfies the numerosity standard because it is comprised of at least 50-100 persons in New York City. As a result, joinder of all Prevailing Wage Class members in a single action is impracticable. Prevailing Wage Class members may be informed of the pendency of this class action through mail and/or email.

176. The Prevailing Wage Class members are readily ascertainable. The number and identity of the Prevailing Wage Class are determinable from the records of Defendants in the normal course of business. For purposes of notice and other purposes related to this action, their names and addresses are readily available from Defendants.

177. The Prevailing Wage Class specifically excludes Defendants, any parent, subsidiary, or affiliate of any Defendant, any entity in which Defendants has a controlling interest, or which Defendants otherwise controls, any officer, director, legal representative, predecessor, successor, or assignee of Defendant.

178. Notice can be provided by means permissible under Fed. R. Civ. P. 23.

179. Plaintiff's claims raise questions of law and fact common to the Prevailing Wage Class.

180. The questions of law and fact common to the Prevailing Wage Class arising from Defendants' actions include, without limitation, the following:

   a. Whether Con Ed breached its agreement or contract with New York City to ensure that the Prevailing Wage Class would receive prevailing wages.

   b. Whether Con Ed breached its contract with D'Onofrio/Doe Entity when it failed to ensure that flaggers on Con Ed funded projects would receive prevailing wages.

   c. Whether D'Onofrio/Doe Entity breached its contract with Con Ed by failing to pay flaggers the prevailing wage.

26

181.    These common questions of law and fact arise from the same course of events, and each class member will make similar legal and factual arguments to prove liability.

182.    Plaintiff is a member of the Prevailing Wage Class that she seeks to represent. Plaintiff's claims are typical of the claims of the Prevailing Wage Class, and she has no interest that are antagonistic to, or in conflict with, the interests of the putative Class because she worked as a flagger and did not receive prevailing wage, and thus was damaged by the same breaches that define the Prevailing Wage Class.

183.    Plaintiff's interests are co-extensive with those of the Prevailing Wage Class that she seeks to represent in this case.  Plaintiff is willing and able to represent the Prevailing Wage Class fairly and to vigorously pursue their similar individual claims in this action.  Plaintiff has retained counsel who is qualified and experienced in employment class action litigation, and who is able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.  The combined interests, experience and resources of Plaintiff and his counsel to litigate the individual and Prevailing Wage Class claims at issue in this case satisfy the adequacy of representation requirement of Fed. R. Civ. P. 23(a)(4).

184.    Defendants have acted or refused to act on grounds generally applicable to the Prevailing Wage Class, making final injunctive and declaratory relief appropriate with respect to the Prevailing Wage Class as a whole.

185.    Injunctive and declaratory relief are the predominate relief sought in this case because they are the culmination of the proof of Defendants' individual and class-wide liability and the essential predicate for Plaintiff's and the Prevailing Wage Class's entitlement to monetary and non-monetary remedies to be determined at a later stage of the proceedings.

186.    The common issues of fact and law affecting Plaintiff's claims and those of the Prevailing Wage Class members, including the common issues identified above, predominate over any issues affecting only individual claims.

187.    A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the Prevailing Wage Class.  There will be no difficulty in the management of this action as a class action.

188.    The cost of proving Defendants' violations makes it impracticable for Plaintiff and the Prevailing Wage Class to pursue their claims individually.  Maintenance of a class action promotes judicial economy by consolidating a large class of plaintiffs litigating identical claims.  The claims of the Prevailing Wage Class interrelate such that the interests of the members will be fairly and adequately protected in their absence.  Additionally, the questions of law and fact common to the Prevailing Wage Class arise from the same course of events and each class member makes similar legal and factual arguments to prove the Defendants' liability.

189.    Plaintiff is currently unaware of the identities of the Prevailing Wage Class.  Accordingly, Defendants should be required to provide Plaintiff with a list of all persons employed by Defendants in the state of New York as "Flaggers," "Flagmen," and/or similar positions during the Prevailing Wage Class Period, along with their last known addresses, telephone numbers and e-mail addresses so Plaintiff can provide the Prevailing Wage Class with notice and the opportunity to make an informed decision about whether to participate in it.

## PRAYER FOR RELIEF

Plaintiff, the Class, and the Collective demand judgment against Defendants in an amount to be determined at trial for all available relief whether it be equitable, statutory, or economic.

## JURY DEMAND

Plaintiff, the Class, and the Collective demand a jury trial.

SEPPINNI LAW, PLLC

/s/JOHN CRAIN
JOHN CRAIN
SHANE SEPPINNI
MEGAN JONES
ISHA DOSHI (SDNY ADMISSION PENDING)

40 Broad St.
Floor 7
New York, NY
10004

(212) 859-5085
john@seppinnilaw.com
shane@seppinnilaw.com
megan@seppinnilaw.com
isha@seppinnilaw.com